All right, welcome to day three in the East Court room. We have several cases on for argument. We'll look forward to your assistance in unraveling these matters. First case up, United States v. Ayelotan. I may be pronouncing it at all, Mr. Stevenson. Yes, sir, Your Honor. May it please the Court. Good morning, Your Honor. Your Honor, there are several issues that were cited in the briefs filed by the parties. However, for the purpose of oral argument this morning, I'll be focusing on two issues, Your Honor. Those issues will include the use of restraints, the trial courts requiring the defendants to be restrained throughout the proceedings in these matters, as well as what we believe is the improper removal of juror number 20 during deliberations, Your Honor. We'll start with the issue of restraints, Your Honor. Your Honor, what we believe is imperative for the Court to consider— Is that really your strongest argument? Pardon me, sir? Is that really your strongest argument? Well, we— Cut to the chase. We know what he did. Are you going to, for the record, show us that the jurors ever saw the shackles or any of that? Or are you just going head-on, abuse his discretion by putting him in shackles? But help us with understanding, you know, if the jurors saw it, I mean, you know, if there was prejudice. You understand what I'm saying? As opposed to just he shouldn't have done it. Well, Your Honor, as it—I don't believe, number one, it's possible for the jurors to show whether or not that the— it's possible for the record to show whether or not the jurors were aware of the presence of the shackles, because the question—that question obviously was not presented to the jurors, so we don't know that. But I think it's more important than whether or not the jurors saw the shackles, Your Honor. Case law gives us the idea that there's other things that can be considered. Whether or not the use of shackles could interfere with a person conducting business with their attorney, Your Honor. One of the— What's the standard of review on that? The standard of review is for abuse of discretion, Your Honor. All right. Okay. But we believe that what's important, Your Honor, is that there's a question of does it address whether or not the defendant's ability to participate in their own defense. And there are just certain things that the trial transcript would not show. If a person is sitting there shackled, Your Honor, mentally they're aware of that. That's going to affect their movement, their interaction with their attorney. They're going to minimize their movement. Okay, but we're reading a cold record. Yes, sir. What can we learn from the record that would demonstrate that the defendant was impeded in his ability to effectively be represented by counsel? I mean, what can we, you know, discern from the record? Well, Your Honor, I think what's important is that, again, there are a lot of things that the record don't show. But what's important, Your Honor, is we believe that the burden is on the government. U.S. v. Bengals, the Fifth Circuit case, is when no reasons are given by the district court and it's not apparent that the shackling justifies, that the shackling is justified, the defendant does not need to demonstrate actual prejudice. The burden is on the government to prove that an error did not contribute to the verdict, Your Honor. Also, what it does is it requires individualized reasons for shackling a particular defendant. I'll take away your argument on this, and I'm speaking for myself, just trying to cut to it. If your argument is against, you know, he couldn't do it at all, that's one argument. On the other hand, having done it, you know, he abuses discretion. And that's going to say, you know, tell us why. My understanding of the record, the way that the bench is situated, et cetera, the wood comes down, you can't see their feet, jurors can't see the feet, configuration, et cetera. Assuming you've got it on, I mean, you've got to help us understand, not so much the theoretical argument, but how in this case, you know, did the jurors see it? Or your argument that, you know, he couldn't communicate with counsel. I mean, just help us understand how that happened, not the argument that that could be a basis. On this record, I mean, is there counsel or did counsel say to the bench that, you know, my client can't get over here to whisper to me, can't pass notes? I think some of that would be helpful to understand the dynamics of the trial. You follow what I'm saying? Yes, sir. Yes, sir. But I think the problem is we don't know what was in the defendant's mind, Your Honor, during the trial. And why that is imperative, Your Honor, is because Derek v. Missouri stands for the proposition that shackling imposes physical burdens, pain. It can even confuse and it can confuse the defendant and materially abridge their constitutional rights, Your Honor. If a person is sitting there shackled, Your Honor, that is in and of itself is a distraction that would prevent them from being able to clearly communicate with their attorney. They're aware of the fact that they're shackled. They're aware of the fact that there's a jury present. So in their mind, they've got to minimize movement. In their mind, any sudden moves could alert the jury as well, Your Honor. It's undisputed. None of these individuals testified in their own defense, Your Honor. We don't know how the use of shackles caused them to make the decision that it's better for me to remain seated at the defense table as opposed to having to walk up there to the stand and then possibly made aware, me being in the jury box and the shackles moving, me being on the witness stand and the shackles making some type of sound that would alert the jury to their presence, Your Honor. And so, again — The marshals, did the marshals recommend they be shackled? Well, Your Honor, they did. But, Your Honor, the record is void of any evidence that substantiates that. They were there for financial crimes. There was no history of violence in any of these defendants' backgrounds, Your Honor. There was no — What about all the commotion that was caused during the extradition hearing? Well, Your Honor, we — number one, the agent testified to my knowledge. He could not personally testify that he was aware of that. And, Your Honor, again, what's imperative is, just like today, there are multiple people in the courtroom. If the security was needed and someone says, hey, on this particular case, these individuals are in court and security was needed, that's not an indication that I caused the need. It could have been any person in here, Your Honor. And so there is not a sufficient basis, even from the extradition hearing, to say these individuals were the ones who caused the need for security to be alerted, Your Honor. And oftentimes, it's not incumbent for courts to have massive dockets with multiple matters on there. So, again, the record before the Court is that throughout all of the proceedings, they participated, they were cordial, respectful, they abided by the court's orders. So there's not a reason we don't believe that this was justified. Further, Your Honor, the courts have to give — the trial court would have had to give a particular reason that was relevant to this particular matter. They used being short of marshals. Your Honor, that could be a nationwide marshal shortage. That would apply to every single case. That's not an individualized reason, Your Honor, especially when the court didn't inquire to say, you know, can we call in extra staff? Can we — is there anything other that we can do to alleviate that need? So we don't feel — You've identified several issues so that you have portioned through. I think we have your argument on that one. Do you want to use some time on your other ones so you don't run out and not have covered everything? Yes, Your Honor. The next issue we would turn to would be the removal of juror number 20, Your Honor. We think it is extremely important, Your Honor, to note that the record reveals that the court received a note from the juror foreman, and that note just simply said, Your Honor, it made no reference to the individual sleeping. It made no reference to the individual not following the instructions of the law. After that first note was received, there was a second note, Your Honor, that was received. During that time, the court decides to essentially what I call void dire the juror foreman, Your Honor. When you review the record, Your Honor, it is not that juror number 20 was not following the law. It was that juror number 20 had essentially, we believe, what it shows is that they had a difference of opinion than the other jurors, and that's essentially what caused them to be removed, Your Honor. Again, there was reference to this juror sleeping. But what's important, Your Honor, to note is that this juror noted that he may have nodded off for a time or two. What's important, Your Honor, this is a three-and-a-half-week trial. We really have no comparison because we don't know. No one ever asked the other jurors, did you go to sleep? Did you see anyone else going to sleep? As well, Your Honor, there was no indication that he missed any material evidence, material presentations, Your Honor. The statements of the other jurors, when the query first occurred, you know, probably what you say is true, and then the judge took the next step and individually voidied the other jurors. Weren't there jurors who said, you know, he was sleeping every day or, you know, he was sleeping on just one more occasion? I mean, what do we do with that? Well, Your Honor, again, there were a number of jurors who indicated that they did not see him sleeping, Your Honor. As well, I think there may have been about three who indicated that they did. What's important, Your Honor, is that the record does not reveal one time during the course of this three-week trial either the trial judge, any defense attorney, or any member of the government ever brought to the court's attention that this juror was sleeping. Your Honor, I think if a – you had a very experienced trial judge in this matter, Your Honor. If you had a trial judge who's observing a sleeping juror, Your Honor, at some point, that trial judge would have noted that, Your Honor. At some point, even the – what was interesting, Your Honor, is after the fact, the government's attorney said, I think I may have seen him sleeping a time or two. But again, Your Honor, they never brought that to the court's attention during the trial. As such, Your Honor, we believe that they waived their right to contest the issue. All of the defendants, Your Honor, essentially waived, as well, their due process, and they stated that they desired to continue with this jury, Your Honor. So we don't believe that there was a sufficient evidentiary basis to remove it, especially considering, Your Honor, the court could have given this juror an Allen charge. The court did none of that. What's important, Your Honor, is that this juror had been deliberating for over a day, Your Honor, could not reach a unanimous verdict. Juror number 20 is removed at 155. At 455, they have a unanimous guilty verdict, Your Honor. That's important, Your Honor. A jury – one jury saying, I have a difference of opinion, Your Honor, should not suffice to be grounds to remove him, especially, Your Honor, when you consider the fact it's undisputed. They said stuff like, he's reading the jury instructions. Well, why are you reading the jury instructions? Because you intend to follow the jury instructions. They indicated he took time to read jury instructions. They even indicated that there were deliberations. He made references to certain things. That's an indication that he's participating, not that he's sitting idly, refusing to contribute to the deliberations. So we believe, Your Honor, all of the evidence shows that he was participating, he was following the law, and it was improper to remove him. The only reason he was removed is because he was essentially what we believe, a holdout jury that had a difference of opinion. And once he was removed from the jury, once that jury was wrongfully removed, Your Honor, within a matter of time, they returned the guilty verdict. And we don't believe that that was proper, Your Honor. As well, Your Honor, what we would point out, even the trial court judge, if you refer to the record on appeal at page 4731, the court drew certain conclusions. The trial court even acknowledged in removing the juror that it drew certain conclusions. Because, again, there is no evidence about what specific testimony that he would have missed, Your Honor, especially considering the fact that he was able to make relevant contributions during deliberations. What's your best case that fits this scenario that says what the judge did was an abuse of discretion? What's your best case? Well, Your Honor, there are several cases. I would point the court to the best case. Okay. Well, Your Honor, even U.S. v. Smith, a Fifth Circuit case that deals with the matter, says essentially a juror who cannot remain awake during much of the trial is unable to perform his duty. However, that's not the case here, Your Honor. The evidence shows that throughout the trial, this individual did stay woke during the trial, Your Honor. So, again, we do not believe that it was proper to remove juror 20. As a result, the defendant's constitutional rights were violated, Your Honor. And we believe that led to the conviction, Your Honor, especially, again, in light of the fact that the judge never even gave an Allen charge, Your Honor. And when you review the record, I want to point out something that's very important. The juror for him who wrote the note, number one, a number of jurors were not aware that the note had been written. Also, when she wrote the note, she made reference to the fact that he said something regarding Western, and she says union, but I think he means union. It's almost as if she was belittling his intelligence, Your Honor. And then I think that shows a personal bias that the juror foreman had toward this particular juror. As well, they made several reference to him not being able to understand the jury instructions, Your Honor, but that was not the case. The indication was that he took his time and read over the jury instructions, Your Honor. When he was questioned by the court, he did answer truthfully all of the courts. And he even acknowledged, I may have not at all, but I'm able to perform my job. I believe I heard enough of the trial to be able to make an intelligent and informed decision. So, Your Honor, we believe that that removal was improper. Do you have a third issue? Or was it just those two? It was just those two. I mean, there were other issues that were cited in the brief, but just those two that we chose to address. Okay. Thank you, sir. You've reserved your vote. All right. We'll hear from the government. Were you trial counsel? I was, Your Honor. I always love to have trial counsel. I'm very happy to be here. It just helps sharpen the questions. Well, good morning. May it please the Court. Connor Mulrow from the United States. Your Honors, the district court in this case conducted a trial that was meticulously fair in every respect. It likewise conducted a thorough sentencing at which it made accurate findings of fact, correctly calculated guidelines based on those facts, and then imposed sentences that were within the guidelines and sentences that were proportionate with the offenses that these defendants committed. Now, there are a number of issues at appeal. I think that our brief covered each of them in some detail, so I'm not going to try and retread all that ground this morning. I would, however, like to respond to a couple of the points raised by my colleague on the other side during the opening argument, and the first being the restraints that this district court found there was a good cause to put on the defendants over the course of the trial. Now, beginning with the record, Your Honors, I think that there are two important points on the record here. First, there is absolutely no suggestion anywhere in the record that any juror saw these restraints at any time. Second, the record is equally clear that the district court took very thorough measures to ensure that no juror would become aware of the restraints. And Chief Judge Stewart, you mentioned some of those at the beginning, but the district court actually had custom wood panels brought into the courtroom to put in front of counsel table so they would conceal the restraints. The district court had these restraints taped up and padded so there was no chance they would make any sound, and the district court also did away with the normal practice of the parties standing for the jurors when they come in and out so that there was no way that in the movement these restraints would ever become visible. And so the lack of any sign that the jurors perceived these things, we would submit, is fatal to the appellant's argument here. Now, there was some suggestion from my colleague that there could be other effects of these restraints apart from their effect on the jury, and there is some reference in that in some of the cases, such as the fact that the restraints might confuse them or affect their ability to testify. But none of that is present here either. Any kind of interruptions or numerous recesses or something that may import to counsel opposite thought that the communication ability of the defendants because of the shackles might have been impaired? I mean, was there anything in the record that would indicate an inability of the defendants to either be near counsel or whatever? There is not, Your Honor. My recollection from the trial, and I believe the transcript reflects this also, is that each of the trial counsel initially was not seated next to their client, and then as the evidence began that they actually moved and were next to the client. So just like in any other trial, they would have had the opportunity to confer while the evidence was coming in, and then the trial also had the ordinary number of recesses and breaks and things of that nature. So there's simply no evidence and there's no inference that these restraints would have impeded the communication ability. Regarding the defendants' choice to testify, the defendants, of course, at the close of the government's case were offered that opportunity and given the opportunity to consult with their counsel, and each of them on the record said that they understood the rights that they were waiving and they did not wish to testify in their own defense. Just out of curiosity, did the judge discuss with you all, just say in the instance one of the defendants had chosen to testify, how they would have dealt with the shackles? There was no discussion of that at the trial. However, there were two cooperating defendants who were in custody at the time of their testimony. They appeared in the courtroom restrained, and the process that the court used there was to bring the witness in and have the witness take the witness stand prior to the jurors coming in. So in that case, there was no suggestion the jurors would see the restraints on those witnesses, and I think it's reasonable to infer that the same process would have been used had either or any of the three defendants chosen to testify. Now, regarding the burden on this issue, counsel discussed the Benegas case a little bit, and I think, in fact, Benegas teaches that it's necessary for the defendants to make some affirmative showing. Benegas involved a very different record where the district court, unlike here, had not articulated any particular reasons for the restraints and where the record revealed that it was a possibility that the jurors might have seen them. And so Benegas held that in those circumstances, the burden is on the government to show that there was no actual prejudice. Here is exactly the opposite situation, and so I think there's the reasonable inference from that that it's the defendants who have got to make some showing. Because otherwise, if the absence of any evidence one way or the other was enough to infer prejudice, then the district court really would almost never be able to make the decision to restrain defendants, you know, without causing problems at the appellate stage. As I said, the court did articulate specific reasons here. Those reasons were twofold. First was the case agent testimony that the defendants had caused a disturbance during the extradition proceedings in South Africa. And so the agent's testimony, I respectfully disagree with opposing counsel, did not open any possibility that it was members of the gallery who were observing those proceedings who caused the disturbance. He did specifically say it was the defendants at the extradition hearing, and specifically that defendant group involved Mr. Rahim and Mr. Ayaloden, two of the trial defendants. So that was entirely proper for Judge Oserton to rely on, as well as the advice of the marshals. And, again, I would disagree that the marshals' advice in this case was specific to this particular trial and would not apply to every trial in the country. And United States v. Fields from this court says that it is proper for the court to rely heavily on the advice of the U.S. marshals when making this important determination. Moving next, Your Honors, to the issue of the removal of juror number 20, there was some discussion about the effect of this juror sleeping. I don't take the appellants to contest that he was, in fact, sleeping. The argument from my colleagues seemed to be that he may have been sleeping, but it didn't have that much of an effect on the trial. I think common sense, as well as the record, indicate the opposite. Multiple of these jurors' colleagues testified to the extent of the juror's sleeping. They testified that he slept multiple days, sometimes multiple times per day, sometimes for extended durations, and that that sleeping happened during the testimony and the evidence. So we're not talking about sleeping during an extended sidebar where nothing important is happening, but we're talking about the real meat of the trial and the stuff that he's going to need to be able to deliberate properly. This was a three-week trial, but every day of that three-week trial was important. So the length of the trial, respectfully, has nothing to do with the effect of whether a juror was sleeping during that trial. And it's also somewhat beside the point that neither the parties nor the judge brought any sleeping to the Court's attention prior to these notes coming from the jury. Counsel observes that Judge Oserton is an experienced trial judge. Certainly, we agree with that. And based on that experience, he knows his ability to perceive things and he knows when he's able to rely on the credible testimony of others. And Judge Oserton drew on that experience in determining that the multiple members of the panel who testified about the extent of a juror's 20 sleeping were sufficient to make the finding that this juror was unable to discharge his duties. Now, the sleeping, I think, may be the most important factor here, but Judge Oserton, in fact, identified several other factors that caused Juror 20 to become disqualified. Our position would be that any one of those factors, standing alone, would have been sufficient. But altogether, in the totality of the circumstances, certainly there were more enough to compel this juror being removed. Those were, first, the sleeping. Second, the fact that he was not candid with the court when he was asked about the sleeping. Third, the fact that he was failing, either because he was unable or because he was unwilling, to follow the court's instructions. And fourth, that he was refusing or failing to deliberate with the other members of the panel. And to amplify that fourth point a bit, Your Honor, the record does not show that this juror had a difference of opinions on the merits. If he was a vote for acquittal and the others wished to convict, that would make him a holdout, but that would also make him someone who was actively deliberating with his colleagues. What about the note? Was there a note about something? Yes, Your Honor. There were two notes related to this issue. They came very close to one another, and I'll have to paraphrase from memory, but the first one, I believe, said that there is one juror who we can't get any opinion from. And the second one, I'm not sure whether it was signed. I believe that during the four persons' testimony, it may have came out that she was the author of the notes, but I would have to check the record on that. The second note went into more detail about the problems, and it actually numbered them 1, 2, and 3, and it was related to the sleeping. It related to the Western Union issue that counsel alluded to before, and it also said that Juror 20 was not following the court's instructions. And so I do want to mention that Western Union piece because it came up in the reply briefs and it also came up at argument. In the reply briefs, there was some discussion over whether it would, in fact, have been proper for Juror 20 to consider his own experiences or beliefs about Western Union, even if they were contradicted by the trial evidence. Now, whichever way that issue goes, that's going to have no bearing on the resolution of this issue because the extrinsic evidence instruction was one of three instructions that the district court found this juror was failing to heed. And the other two, I would submit, were even more important. One of those was that Juror 20 apparently believed that the attorney's closing arguments were evidence that he could consider, which is flatly contradicted by the court's instructions. And the other is that he was allowing sympathy to guide his deliberations, which, again, multiple other jurors testified to. So the Western Union, whether that was right or wrong, is largely beside the point. And then I would also just briefly address the suggestion by my colleague that the misspelling of Western Union in the note should be taken as somehow an attack on the intelligence of Juror 20. I think, frankly, that's worse than speculative, and I think, if anything, it was the foreperson herself who misspelled this note. But that, I would submit, is entitled to absolutely no weight in this Court's determinations. Again, Your Honors, there's just no evidence in the record here that there was a difference of opinion with this juror. The record shows that he wasn't presenting or forming any opinion whatsoever. And, again, the testimony of the jurors suggests multiple reasons for that. Maybe he just is not capable of following the court's instructions. There was evidence that he had trouble comprehending them and that he would retreat to the corner by himself and simply reread the same one over and over again. But whatever the reasons, he was not a holdout. This was not a difference of opinion on the merits. And so the speculative notion that he may have been targeted by his fellow jurors on that is just not there in the record. On that point, I would direct the Court's attention to United States v. Ebron. Chief Judge Stewart, you authored this opinion, and it actually gets into the issue of when the Court needs to worry about whether a dismissal might have been motivated by the merits. Ebron explained that that rule is only applicable if the dismissal was based entirely on the juror's failure to deliberate. And as I've already explained, the failure to deliberate was one of the factors here, but it was one of four independently sufficient factors. So that covers the restraints and the jurors' issue. I do just want to say a word or two about the sentences because the sentences in this case are substantial. But the magnitude of those sentences reflects and is proportionate with the magnitude of the offenses that these defendants committed. These defendants were part of a vast international conspiracy. It was wide in geographic reach. It was vast in temporal scope. As the Court below found, it affected numerous, numerous victims, and it caused very serious harms. Now, part of those harms are emotional harms upon the victims who were targeted by romance scams, but more quantifiable are the financial harms that these defendants sought to inflict. And so these guideline sentences, which prior to being capped with the statutory maximums, were guidelines of life in the case of Mr. Ayaloden and Mr. Rahim, those were driven primarily by the intended losses that this district court properly found during sentencing. Those were intended losses, Your Honors, of more than $52 million. And it bears noting that the threshold for the loss bracket that these defendants fell into under the guidelines was only $25 million. So they better than doubled that with their financial harms. And in other words, even if the district court below were to have cut the loss amounts in half, that would not move the needle a bit on these defendant's sentences. Now, regarding the particulars of the remaining issues, we're happy to stand in the arguments from the brief. I'm happy to answer any questions the Court might have on those. But seeing none, we would urge this Court to affirm each of the judgments of conviction and each of the sentences from the Court below. Thank you. All right. Back to you, Mr. McFarland, for rebuttal. Yes, sir. Just briefly, Your Honor, we would point out that, again, as it relates to the restraints, you can't get the answer to a question that was never asked. We don't know if the jury knew anything about the jurors, knew anything about the presence of restraints, because the record doesn't show it does not mean it does not give us an answer, because it was never, obviously, never asked of the jury. So we don't know whether or not they were made aware of the presence of restraints. But, again, we don't believe that that's the most, that that is the only consideration. Under Derrick v. Missouri, the defendant does not need to demonstrate actual prejudice. The burden is on the government to prove beyond a reasonable doubt that the error did not contribute to the verdict. Your Honor, again, the burden is on the government here. And we would also point out, Your Honor, as it relates to the issue of sleeping, what the defense, what jury number 20 said was, if I went to sleep, it was minimal. There was nothing in the record to dispute that. What one of the jurors said was, I saw him go to sleep maybe two to three minutes over a couple different times. Your Honor, we believe it sets a dangerous precedent if jurors, a few jurors can get together and say, there's a juror who we believe has a difference of opinion, and we're going to get him off the jury and get him replaced with an alternate who may think more like us. That's a very dangerous precedent to set in this circuit, Your Honor. Again, juror number seven, there is no indication that when she wrote that note, that she had discussed it with the other members of the jury, certainly not juror number 20, Your Honor. And again, she made reference to how he pronounced Western Union in her note. I believe she was belittling him, Your Honor. She was using it to attempt to move him from the jury pool, Your Honor. We would also point out, as it relates to sentencing, Your Honor, Your Honor, the record is undisputed. These people were sentenced for financial crimes, nonviolent offenses. We're talking about 95 years. A lot of money, though, counsel. Sir? A lot of money. Yes, sir, I understand that. But again, Your Honor, 20 years would have been ‑‑ all of these sentences could have ran concurrent, and they still would have had substantial prison sentences. We believe, Your Honor, that it was unnecessary to stack the sentences, Your Honor, and it does not further the purposes of 3553 factors, Your Honor. We believe the sentence was greater than necessary, Your Honor. Again, 95 years, 106 years. How old were the defendants? Your Honor, most of them were in their 30s, Your Honor. And so, I mean, again, Your Honor, I'm 35. A 95-year sentence for me is a life sentence. For any person in this courtroom, a 106-year sentence is a life sentence, a life sentence for nonviolent crimes. Most of these people were criminal history category 1, Your Honor. So, they face the same sentence as people who commit not just one murder, but multiple murders, Your Honor. We believe that that's inappropriate. Economic crime, and once the guidelines are applied against the amount of money involved, the risk, and all the other factors, it doesn't automatically equate to a violent crime, does it? I mean, the guideline is set up to deal with a whole range of offenses. Yes, Your Honor. The sentence these individuals received is equivalent if they had killed 10, 15, 20 people, Your Honor. Taking your point as true, what's your best case to say that the judge abused discretion, much as the trial judges do with sentencing? I mean, what's your best case that we should look at that he abused it by going over the top? Well, Your Honor, I believe that's what the appellate courts are here for, Your Honor, as it relates to 35, 53 factors to see. Tell us why we're here? Oh, no, no, no, sir. I don't mean that. What I mean is this court is best positioned to see if the sentence was about case, Your Honor. What was your best case? Your Honor, we were just— What was your best case, not a bunch of other cases. If you want us to overturn it, you've got to point us to something that directs us that we're compelled to do something different. So I'm just asking. I mean, it's in your brief, but, I mean, what's the best case we ought to look at in terms of appreciating the argument? That's all I'm asking. Your Honor, I cannot recall, or at least I cannot label what I believe will be the best case, but I believe the brief that the case is cited in this section of the brief all speak to that proposition, Your Honor. Okay. Okay. Thank you, counsel. I note that you are CJA appointed counsel in this case, and in this case, like all cases, we could not survive without having erstwhile counsel to represent defendants in these complicated cases at trial and on appeal, and we appreciate your zeal and your preparation to come and present the case to us in brief and in argument. Thank you, Your Honor. Thank you. Thank you to the government for ably presenting the case. We'll read the record, figure it out, and we'll decide it. All right. We'll call up the second case.